```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF VIRGINIA
 2                           ABINGDON DIVISION

 3    UNITED STATES OF AMERICA,
                                           No. 2:16-cr-3
 4                    Plaintiff,
                                           Abingdon, Virginia
 5        vs.                              September 7, 2016
                                           11:19 a.m.
 6    JAMES MONROE COX,

 7                        Defendant.

 8                 TRANSCRIPT OF MOTION HEARING/GUILTY PLEA
                  BEFORE THE HONORABLE PAMELA MEADE SARGENT
 9                    UNITED STATES MAGISTRATE JUDGE.

10    APPEARANCES:

11    For the Government:

12    MARTHA SUZANNE KERNEY-QUILLEN
      United States Attorneys Office
13    180 West Main Street, Suite B19
      Abingdon, VA 24210
14    276-628-4161

15

16    For the Defendant:

17    NANCY COMBS DICKENSON
      Federal Public Defenders Office
18    201 Abingdon Place
      Abingdon, VA 24211
19    276-619-6080

20

21    Transcribed by:   Carol Jacobs White
                         Official Court Reporter (Retired)
22                       Registered Diplomate, Realtime Reporter
                         PO Box 182
23                       Goode, VA 24556
                         Carol.jacobs.white@gmail.com
24
            Proceedings recorded by FTR; computer-assisted transcription.
25
```

1       (Call to Order of the Court at 11:19 a.m.)

2           THE COURT:  Good morning.

3           The Court has before it this morning the case of the

4    *United States of America versus James Monroe Cox.*  It is Case No.

5    2:16-cr-3.  Mr. Cox is the only defendant in the case.

6           Mr. Cox and his counsel are before the Court today, as

7    well as counsel for the government, related to a motion to withdraw

8    filed by his counsel, Ms. Dickenson.  It is docket item number 45.

9    Mr. Cox is set for a jury trial in November.  His case had

10   previously been continued and is now set for the November date.  I

11   have it set for November 7 and 8.  It has been transferred to Judge

12   Urbanski.  That is why it was continued until that date.  And

13   Ms. Dickenson has now filed the motion.

14          Ms. Dickenson, do you have any other argument or evidence

15   you wish to present on the motion?  I have read the motion.  And my

16   understanding is that you received a letter from Mr. Cox requesting

17   that you withdraw from his representation; is that correct?

18          MS. DICKENSON:  That is correct, Your Honor.

19          THE COURT:  And therefore you filed the motion.

20          MS. DICKENSON:  Yes.

21          THE COURT:  Based on your motion, it appears that you

22   have concerns about whether or not the defendant has any further

23   confidence in you, but you do not state that you know of any

24   reasons why you and/or your office cannot fully and adequately

25   represent the defendant.

```
1              MS. DICKENSON:  That's correct, Your Honor.

2              THE COURT:  All right.

3              MS. DICKENSON:  And in speaking with Mr. Cox at the jail

4    a few days ago and most recently this morning, I gather from

5    Mr. Cox that he does not wish for me to withdraw; that he would ask

6    the Court that the motion to withdraw be declared moot.  But I

7    would ask the Court to question Mr. Cox regarding that.

8              Additionally, Your Honor, Mr. Cox has indicated to me

9    this morning that he desires to enter a guilty plea and that he is

10   requesting that he be allowed to do that today.

11             THE COURT:  Okay.

12             MS. DICKENSON:  And this is a sea change, Your Honor,

13   from my last conversation with Mr. Cox, so I do have some concern

14   about the change in his view of the case.  So I would ask the Court

15   to inquire of Mr. Cox as to this --

16             THE COURT:  Well, Mr. Cox, if you'll stand, please, so I

17   might address you.

18             Mr. Cox, is it your desire now that Ms. Dickenson

19   continue to represent you in the case?

20             THE DEFENDANT:  No, ma'am, I would rather represent

21   myself, with her along, because -- I don't want to plead out

22   -- plead guilty.  So -- and there's enough evidence -- I read the

23   motion for discovery, so there's no need for an attorney

24   furthermore.

25             THE COURT:  Well, Mr. Cox, you may be competent to go
```

1    forward not represented.  That may be a possibility.  Okay?

2              THE DEFENDANT:  They did an evaluation.  They found me

3    competent.

4              THE COURT:  Exactly.  But if I were to relieve

5    Ms. Dickenson and allow you to represent yourself, there's a

6    separate inquiry I have to go through.  Okay?  Before I go to the

7    trouble of doing that, however, what I would like to say to you is

8    this.  The charges you face are serious charges.  I urge all

9    defendants who come before me, when they face charges that are

10   likely to result in a period of incarceration, as yours are -- they

11   are felony charges -- I urge all defendants to be represented.

12   Okay?

13             Now, you can continue to be represented and plead guilty.

14   All right?  The one choice that you have that is your choice

15   entirely, okay, in the presentation of your case is how you plead.

16   All right?  If it is your desire to plead guilty to the charges you

17   face, then you may do that and we'll schedule you for a guilty plea

18   hearing.

19             What I would urge you, though, is that you should

20   continue to be represented, because there could be some

21   unanticipated issues with regard to your sentencing that the

22   assistance of counsel could be needed on.  Sentencing in the

23   federal courts now is a complicated process.  We have the federal

24   sentencing guidelines.  They must be considered, but they are not

25   mandatory.  Calculations under the sentencing guidelines with

1   regard to offense levels and criminal histories are complicated

2   things.

3          And so what I would urge is I would urge -- I'll be

4   honest.  I'm an attorney, Mr. Cox.  If I were charged with a crime,

5   I would not represent myself.  Okay?  I would want counsel to

6   represent me.

7          If you are insistent in wanting to represent yourself, I

8   will go forward with the litany to determine if you are competent

9   to do so, but I would urge you to rethink that.

10          Now, after my speaking to you, Mr. Cox, do you still wish

11   for me to consider whether or not to remove Ms. Dickenson or would

12   you like for Ms. Dickenson to remain as your counsel?

13          THE DEFENDANT:  She can remain.  I mean --

14          THE COURT:  All right.  I think that's the wise decision,

15   Mr. Cox, because you need to be represented by counsel.

16          Now what I'm going to do is have them mark the motion to

17   withdraw as counsel as moot.  Okay?  And that's going to be taken

18   off the table.

19          Now, with regard to your desire to plead guilty, the

20   Court can set you for a guilty plea hearing.  But I have to consult

21   with Judge Jones.  And it may very well be that he's here and he

22   will take that today or he may ask that that be taken on another

23   date.

24          Ms. Dickenson?

25          MS. DICKENSON:  Your Honor, I believe Judge Jones has --

1          THE COURT:  Oh, I'm sorry.  Judge Jones has recused

2    himself.  I apologize.  Judge Jones has recused himself.  So it

3    will be Judge Urbanski, who is not present today.

4          Now, if you want to take a brief recess, we can consult

5    Judge Urbanski and see if for any reason he wants to refer the

6    guilty plea to me.

7          I will just advise you, you have a right to have your

8    guilty plea, because it is a felony charge, before a district court

9    judge.  And I'm the magistrate judge.  If you waive that right and

10   consent, I can take the guilty plea.  Okay?

11         THE DEFENDANT:  Can we do that today?  I mean --

12         THE COURT:  Well, we can, if Judge Urbanski will allow me

13   to do that and if you are willing to waive your right.  You

14   understand you have a right to have that plea hearing before the

15   district court judge?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  And I'm a magistrate judge.  I'm not a

18   district court judge.  You understand that, Mr. Cox?

19         THE DEFENDANT:  You are still a judge.

20         THE COURT:  Well, that's true.  And I do have the

21   authority to take the plea, if you consent to it.

22         THE DEFENDANT:  All right.

23         THE COURT:  But I just have to make sure you understand

24   what your rights are.

25         THE DEFENDANT:  I'd be willing to consent.  I mean, I

1    just want to get this, you know, pretty much over with.

2             THE COURT:  Now, the other thing I just want to say to

3    you is this.  The charges against you changed recently.  Additional

4    charges were added.  Okay?  I want to make sure that you understand

5    that you are not going to be prejudiced in any way if you take

6    additional time to consider a plea before you plead guilty.  Do you

7    understand that?

8             THE DEFENDANT:  Yes, ma'am.

9             THE COURT:  Okay.  But -- because, you know, you and your

10   counsel might have things you want to discuss before you enter a

11   guilty plea on those charges.

12            I will tell you this, in the end, if it is your desire to

13   enter a plea, you control the ability to do that in so long as the

14   Court decides that you are competent to do so.  Okay?  But there's

15   no rush about it.  It doesn't have to be done today.

16            And I want to make sure you understand this, Mr. Cox,

17   even if Judge Urbanski should allow me to take your guilty plea

18   today, you won't be sentenced today.  You would be sentenced in

19   about 75 days from today.  So you will still be held for a while

20   here locally.  Do you understand that?

21            THE DEFENDANT:  Yes, ma'am.

22            THE COURT:  All right.  Now, with me telling you all of

23   that, is it still your desire to go forward today with the guilty

24   plea to your charges?

25            THE DEFENDANT:  Yes, ma'am.

1              THE COURT:  All right.  We're going to take just a brief
2      recess, if that fits in your schedule, ladies?
3              MS. DICKENSON:  It does.
4              THE COURT:  We'll take just a brief recess and see -- we
5      may not even be able to get through to Judge Urbanski, but we're
6      going to see if we can get through to him to see if he will agree
7      for me to take the plea.  Okay?  And if he will, then we'll go
8      forward today and I'll determine whether or not Mr. Cox is
9      competent to enter his plea today.
10             MS. DICKENSON:  Thank you, Your Honor.
11             THE COURT:  All right.  Let's take just a brief recess.
12        (Recess at 11:28 a.m.)
13        (Call to Order of the Court at 11:51 a.m.)
14             THE COURT:  All right.  We're back on the record in
15     Mr. Cox's case.
16             Mr. Cox has informed the Court that he wishes to enter a
17     guilty plea -- this is without the benefit of a plea agreement --
18     to the charges he faces.
19             There's a typo on that, Ella, if you want to correct
20     that, on his name.
21             And I have consulted with Judge Urbanski's office.  And
22     Judge Urbanski has advised me that if Mr. Cox is agreeable for the
23     magistrate judge to take his plea, that I may go ahead and take his
24     plea on referral.  All right?
25             Mr. Cox, I'm going to allow you to remain seated while I

```
 1   question you.  I think everybody will just be a little more

 2   comfortable -- you will be a little more comfortable and everybody

 3   else will be a little more comfortable.  So I'm going to allow

 4   that.

 5           Just -- before we go through -- before I have you placed

 6   under oath, I just want again to advise you that the charges you

 7   face -- actually, there was an indictment and then there was a

 8   superseding indictment issued against you, Mr. Cox.  I want to make

 9   sure that you understand that all of those charges are felony

10   charges.  And as we discussed just a moment ago, you do have a

11   right to have your guilty plea hearing before the district court

12   judge, Judge Urbanski, to whom this case is assigned, or you may

13   waive that right, give up that right, and I may take your plea.

14           I am a magistrate judge.  And if you are agreeable to

15   waive your right to have your plea before the district court judge

16   and are agreeable to have me take your plea, then I may take your

17   plea.

18           Now, we discussed that just a moment ago.  Correct,

19   Mr. Cox?

20           THE DEFENDANT:  Yes, ma'am.

21           THE COURT:  Okay.  Now, is it your desire to waive your

22   right to have your plea before the district court judge?

23           THE DEFENDANT:  Yes, ma'am.

24           THE COURT:  I need you to answer out loud yes or no, sir.

25           THE DEFENDANT:  Yes, ma'am.
```

1    THE COURT:  You don't have to lean forward, Mr. Cox.  It
2  will pick you up just fine.
3    Okay.  I have a waiver form here.  And I want to read
4  that waiver form to you.  It has the caption of your case.  And it
5  says, "Consent to allow United States Magistrate Judge to accept
6  plea."
7    It states, "The defendant in this case hereby voluntarily
8  consents to have a United States Magistrate Judge conduct a plea
9  hearing in this case.  The defendant has been informed of his right
10  to enter his plea before a United States District Judge.  The
11  defendant hereby waives his right to enter his plea before a United
12  States District Judge and consents to jurisdiction before the
13  United States Magistrate Judge for the purpose of entering his plea
14  and conducting a plea hearing."
15    Now, if you are agreeable to that, Mr. Cox, if you will
16  sign on the line for the defendant's signature.
17    Ms. Dickenson, if you'll sign, agreeing as counsel for
18  the defendant.
19    And Ms. Kerney-Quillen, if you'll sign indicating the
20  government's agreement.
21    (Pause.)
22    THE COURT:  All right.  Thank you, Mr. Cox.
23    What I'm going to do, sir, is I'm going to get you just
24  to remain seated and raise your right hand.  I have got some
25  questions I need to ask you.  And I'm going to have the clerk place

1   you under oath before I go forward.

2           If you'll raise your right hand, please.

3                   JAMES MONROE COX, DEFENDANT, SWORN

4           THE COURT:  Now, Mr. Cox, do you understand that you are

5   now under oath; and if you do not answer my questions truthfully,

6   your answers may later be used against you in another prosecution

7   for perjury or making false statements?

8           THE DEFENDANT:  Yes, ma'am.

9           THE COURT:  Now, I want to just advise you, Mr. Cox, if

10  at any time today you don't hear me, ask me to repeat myself.  I'll

11  be glad to do so.  If at any time you don't understand one of my

12  questions, if you ask me to clarify or explain it, I'll be glad to

13  do that.  Or if at any time you believe you need additional time to

14  speak with Ms. Dickenson with regard to answering a question, if

15  you tell me that, I'll be glad to give you time to do that.

16          Do you understand all of that, sir?

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Now, Mr. Cox, would you tell me your full

19  legal name, please?

20          THE DEFENDANT:  James Monroe Cox.

21          THE COURT:  And how old are you, sir?

22          THE DEFENDANT:  37.

23          THE COURT:  How far did you go in school?

24          THE DEFENDANT:  Eleventh grade.

25          THE COURT:  Have you subsequently received your GED or

```
 1    had any additional training?

 2              THE DEFENDANT:  I've just been working on it, but it is a

 3    slow process.

 4              THE COURT:  All right.  Now, Mr. Cox, you have been

 5    incarcerated for a period of time; is that correct?

 6              THE DEFENDANT:  Yes, ma'am.

 7              THE COURT:  What charges -- I mean, I understand you have

 8    these charges pending against you in this court.

 9              THE DEFENDANT:  Yes.

10              THE COURT:  But my understanding is you are also serving

11    a state court sentence; is that correct?

12              THE DEFENDANT:  Yes, ma'am, for attempted -- attempted

13    robbery on a bank with the use of a firearm.  Then I had an old

14    -- old burglary back in 2000, so that I had -- for the bank -- for

15    the bank thing I had six years and nine months.  And then for the

16    burglary I had four years -- four years, eleven months.  So all

17    together I ended up, like, ten years -- ten years and 20 months.

18              THE COURT:  Almost eleven years; correct?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Okay.

21              THE DEFENDANT:  Yes, ma'am.  But I have been locked up

22    since May --

23              THE COURT:  On these charges.

24              THE DEFENDANT:  Well -- in federal?

25              THE COURT:  In federal.
```

1          THE DEFENDANT:  Well, the federal, I have been in

2    you-all's custody since March.

3          THE COURT:  March.  Okay.

4          THE DEFENDANT:  But state, I was -- been locked up since

5    May, May the 22nd, 2007.  That's how --

6          THE COURT:  May 22nd of 2007 is when you first came into

7    state custody?

8          THE DEFENDANT:  Yes, for the bank, for the bank thing.  I

9    have a violation for the feds in 2009.  They violated my federal

10   probation in 2009.  I went in front of the U.S. District in Norfolk

11   in 2009 for violating my -- the new state charges violated my

12   -- you know, trying to rob a bank violated my probation, my federal

13   probation.  So they -- they gave me -- he sentenced me to 23

14   months.  But what happened was when he violated and sentenced me to

15   23 months, I had to go back in state custody to finish up the rest

16   of my state time.  He said, "After you do your state time, then you

17   will go back and do 23 months for your violation."

18         THE COURT:  And you haven't finished that underlying

19   state court sentence yet; correct?

20         THE DEFENDANT:  My discharge date from the state is

21   January -- January 30th, 2018.  So I have still got a year -- a

22   year --

23         THE COURT:  And then, when you finish that, you will have

24   24 -- 23 months on your federal probation violation.

25         THE DEFENDANT:  Yes, that old U.S. District in Norfolk.

1        THE COURT:  What were you convicted of in the U.S.

2   District Court in Norfolk that you were on supervised release or

3   probation for?

4        THE DEFENDANT:  I threatened -- I threatened to

5   assassinate George W. Bush in 2003, threatened to kill George W.

6   Bush.  And the Secret Service came and pressed charges on me, the

7   Secret Service in Virginia Beach.  And they did me four years

8   -- they sentenced me to four years -- four years and three months

9   for that.  I got out and --

10        THE COURT:  And you were out on supervised release when

11   the conduct occurred with regard to the bank robbery?

12        THE DEFENDANT:  Yes, ma'am.  I was -- I just got of USP

13   -- USP Terre Haute, Terre Haute, Indiana.  And I just got out.  And

14   I was on two years -- two years supervised -- supervised release,

15   probation, for the U.S. District in Norfolk.

16        THE COURT:  All right.  Now, do you read and write the

17   English language?

18        THE DEFENDANT:  Yeah, ma'am.  U.S. citizen.  I was born

19   in Houston, Texas.

20        THE COURT:  Well, but, I mean, you can be a U.S. citizen

21   and not be able to read and write.  And you can even be a high

22   school graduate and not be able to.  That's possible.

23        THE DEFENDANT:  Well, I went eleven years -- I went to

24   eleventh grade.  I mean, I was almost done with my credit.  I

25   almost had my high school diploma.  I just -- through the

1   circumstances, I wasn't able to complete -- I didn't drop out or

2   nothing.  I just -- the circumstances were kind of rough.  And so I

3   ain't had a chance to finish my high school -- high school diploma.

4         I have been working on a GED.  The last time I was in

5   prison I was trying to -- I passed everything.  I score high on

6   everything.  Grammar and everything, I score high.  It is just math

7   -- I always, you know, fail on my GED because I can't pass the

8   math.  The math exams, that's the only subject I can't pass.

9         THE COURT:  That would probably be my problem too,

10  Mr. Cox.  I'll be honest with you.

11        Now, I want to talk to you just a little bit about your

12  psychiatric or psychological history.  Okay?  You did undertake a

13  psychiatric or psychological evaluation requested by this court.

14  And you underwent that evaluation earlier this year.

15        THE DEFENDANT:  And Dr. Feldman, I think was her name, in

16  Miami.  The FDC, I went to the FDC in Miami --

17        THE COURT:  Yes, you were at the detention center in

18  Miami.  And I received a report from the psychologist -- let me

19  just see -- Dr. Feldman, the psychologist who created -- who

20  conducted the evaluation.

21        Now, I have that report before me.  But what I want to

22  talk to you just a little bit about is I think that you have gotten

23  some conflicting diagnoses in the past with regard to your

24  psychiatric or psychological health, your mental health.

25        You have been in mental health treatment before; is that

1    correct?

2            THE DEFENDANT:  Since I was ten -- ten years old.  I have

3    been going in and out since I was ten years old, and treatment and

4    stuff.  I had several diagnosis and stuff since I was a kid, even

5    as an adult.  But my history goes all of the way back to when I was

6    ten years old.  I mean --

7            THE COURT:  And I want to talk to you just a little bit

8    about that history.  Back when you were ten years old, you -- I'm

9    just looking here.  Just give me one moment.

10       (Pause.)

11           THE COURT:  You gave a history to Dr. Feldman that you

12   had been in multiple treatment facilities between the ages of 10

13   and 17.  And that is accurate?  Is that a correct statement?

14           THE DEFENDANT:  No.  I told her I was from age 10 -- age

15   10 all of the way in my adult history, because I have been in

16   mental hospitals -- actually, I was in Maryview Mental Hospital in

17   Portsmouth, Virginia.  My federal probation officer put me in the

18   mental hospital right before I got incarcerated this time --

19           THE COURT:  Well, I understand you have also been in

20   mental hospitals as an adult.

21           THE DEFENDANT:  Yes.  I have been in several.  So --

22           THE COURT:  But, basically, from the age of ten you have

23   been in and out of certain treatment facilities, residential

24   programs, and group homes; correct?

25           THE DEFENDANT:  Yes.  And I have been civil committed as

1    an adult too several times.  I have been to -- I have been civil

2    committed to the state hospital in San Antonio, Texas, to -- when I

3    was 20 something, back in 2000.

4            THE COURT:  Now, the most recent diagnosis that I

5    received from Dr. Feldman is that you suffer from a couple of

6    personality disorders.  But I want to know about prior diagnoses

7    you have had.  You said you have been diagnosed with a number of

8    different mental health conditions.  Can you tell me what you have

9    been diagnosed with in the past?

10           THE DEFENDANT:  Bipolar, neurologic brain damage on the

11   left -- left side of my brain.  They found that.  When I was

12   younger, they did EEGs and CAT scans on my brain.

13           I suffer depression, emotional disturbed, paranoid

14   schizophrenia, all kinds of bizarre things and behaviors.  Public

15   schools wouldn't accept me in Texas because I had a suicide -- I

16   had a suicide history.  I have been in child protective services,

17   foster care.  I was a ward of the state from 13 and a half to 17

18   and a half.

19           THE COURT:  So, basically, you have had a whole spectrum

20   of different diagnoses in the past; correct?

21           THE DEFENDANT:  I have been institutionalized

22   -- institutionalized most of my life too.  I have been in a lot of

23   mental institutions and facilities in Texas.  And, like I said, I

24   had -- my suicide history goes back since I was, like, 11 or 12.

25   Public schools wouldn't -- regular public schools in Texas wouldn't

1    accept me because my suicide history -- they wouldn't enroll me in

2    the public schools.  I had to go into, like, adaptive behavior and

3    school programs like --

4                THE COURT:  The -- if I may, just, Mr. Cox, the reason

5    I'm asking you questions today is I have to make a determination,

6    one, that you fully understand what you are doing and that you are

7    making the decision to plead guilty knowingly and voluntarily.

8    Okay?  And the reason I bring up your prior criminal -- your prior

9    psychiatric or psychological history is this:  is there is some

10   mention in your psychological history that on occasion you have

11   reported hearing voices that tell you what to do, in the past; is

12   that correct?

13               THE DEFENDANT:  Ms. Feldman said that?

14               THE COURT:  Yes.  It says that -- that based on a review

15   of some of the records --

16               THE DEFENDANT:  I don't remember saying that.  I don't

17   remember telling her I heard -- heard or saw things.

18               THE COURT:  Yeah.  And she doesn't say that you told her

19   that.  Okay?  I want to be clear about that.  Dr. Feldman doesn't

20   say -- she says that she has looked at some records that were

21   provided to you --

22               THE DEFENDANT:  Maybe when I was younger or something.

23   But I don't -- as far as right now, at the present time, I don't --

24               THE COURT:  So you don't believe you currently suffer

25   from hearing any voices of people who are not present?

1          THE DEFENDANT:  Well, I ain't going to lie.  Sometimes

2  -- I ain't going to lie.  Sometimes I get paranoid schizophrenia.

3  I get paranoid and I think people are talking about me.  But when I

4  confront people and say, "Man, did you call me this?  Did you say

5  this and that," the CO say, "I never said that about you.  I never

6  said nothing bad about you."

7          THE COURT:  That's a lot different, Mr. Cox, that kind of

8  paranoia --

9          THE DEFENDANT:  Well, no.  I thought I heard them -- I

10  thought I heard them say it.  I thought I heard the CO, because I

11  have got good ears.  And I thought I heard the CO saying -- he's,

12  like, from where he's sitting at and where my door is at.  And I

13  thought he walked away saying something about me.  And when I

14  confronted the CO and I say, "Did you just call me this and that or

15  did you say this about me," and he was like, "Nah, I didn't even

16  say nothing like that."  So, evidently, I must be hearing things,

17  because if somebody is swearing up and down that, "No, we're not

18  saying nothing about you.  Why are you" -- I must be hearing -- I

19  ain't just paranoid.  I must -- I swore up and down that I heard

20  it.

21          THE COURT:  Let me ask you -- let me ask you this

22  specific question:  Have you heard any voices recently telling you

23  to plead guilty to these charges?

24          THE DEFENDANT:  My inner -- my inner voice.  I mean --

25          THE COURT:  Well, there's a difference between your

1    conscience and your thoughts and you believing that there's some

2    force outside of you --

3                THE DEFENDANT:  But not a voice like yours telling me,

4    "Hey, you had better plead guilty."  Not like that, no.  I don't

5    think I'm that gone.  I don't think I'm that gone.

6                THE COURT:  Well -- and that's very important for me to

7    ask you that, sir, because, you know, I need to know --

8                THE DEFENDANT:  If I was -- I would be kind of scared if

9    I was.  I would be kind of worried, kind of scared there.  But I

10   don't think I'm hearing like that.

11               THE COURT:  And I know that you have a history of self-

12   mutilation and self-harm; is that correct?

13               THE DEFENDANT:  Yes, ma'am.

14               THE COURT:  Okay.  And one of the things I want to make

15   sure, Mr. Cox, is that you are not pleading guilty because of any

16   reason other than you are guilty of the offenses and you wish to

17   plead guilty; that you have made a reasoned decision to plead

18   guilty to the charges.  That's what I'm trying to ascertain.

19               THE DEFENDANT:  Well, I mean, I am ashamed -- I am

20   ashamed of myself.  And that's why I mutilate -- mutilate,

21   sometimes, because I'm real ashamed of myself with my past -- my

22   past history, criminal history.

23               THE COURT:  But do you think that history and -- what I

24   want to try to ascertain from you, Mr. Cox, is whether, sitting

25   here today, you are pleading guilty of your own free will or you

1    feel like something about your mental health history or your

2    behavioral history is compelling you today to enter a guilty plea?

3              THE DEFENDANT:  Oh, no, I strongly believe that I am

4    guilty and I should take responsibility for what I did.  I mean, if

5    I did something wrong, I mean, if I committed a crime, then I want

6    to take responsibility, because I know I'm wrong.  I mean, I know

7    it was against the law to write, you know, bad -- bad letters and

8    stuff, regardless of how I feel, if I'm mad at the world or

9    whatever.

10             THE COURT:  Well, can you tell me -- you are charged with

11   five violations now.

12             THE DEFENDANT:  Is it five different felonies or just one

13   felony or --

14             THE COURT:  No, it is five different felonies, Mr. Cox,

15   that you are charged with.

16             THE DEFENDANT:  Okay.

17             THE COURT:  Okay?

18             You are charged with five violations of the same code

19   section.  And the allegation is that you violated Title 18, United

20   States Code, Section 1114.

21             Give me just a moment.  I'm making sure.  I'm pretty sure

22   all four of them -- all five of them are the same charge.  And they

23   are.

24              I apologize.  You are alleged to have violated Title 18,

25   United States Code, Section 876(c).  That's the charge.

1          Do you -- can you describe to me what you have done wrong

2     that makes you guilty of these offenses?  Do you understand what is

3     alleged that you have done?

4               THE DEFENDANT:  Threatened to kill -- threatened to kill

5     people and --

6               THE COURT:  That you mailed letters threatening harm to

7     others.

8               THE DEFENDANT:  Different -- different officials and

9     -- that's in authority.  And -- it is not right.  I can't say that

10    it -- I mean, I might have felt right at the time.  I might have

11    felt like a righteous game in a pessimistic way.  But -- but it

12    -- it was wrong, because -- I mean, I'm -- I could have been

13    scaring them.  I could have been scaring some people.  I could

14    have --

15              THE COURT:  Well, let me ask you this:  I mean, all of

16    those letters that you wrote, at the time you wrote them, did you

17    know that you should not write letters threatening to harm people?

18              THE DEFENDANT:  Oh, yeah.  I knew -- I knew it was wrong.

19    I know I should -- that I got an inner -- I got a good me too

20    that's telling me, "Nah, you shouldn't do that."  But then I have

21    got like another personality, that is kind of evil, that is telling

22    me, "Ah, go ahead.  Who cares?  It is just the way you feel.  Just

23    do it, I mean, if this is how you feel."  And then I have got

24    another inner voice that tells me, "Nah, you are wrong.  That's

25    wrong.  That's not good.  It is bad," or whatever.

1          THE COURT:  Well, tell me today, as you sit here, do you

2   believe that you currently suffer from any type of psychological

3   symptoms or mental health symptoms?

4          THE DEFENDANT:  I mean, if I do, I'm not going to use

5   that as an excuse --

6          THE COURT:  Oh, I understand that.

7          THE DEFENDANT:  -- a mental aid to try to help beat my

8   case or manipulate it.

9          THE COURT:  But I need to know if you believe you are

10  suffering from any current mental health problem.

11          THE DEFENDANT:  Too -- I'll admit, I have issues, to a

12  certain extent and degree and extent.  But that's -- I mean, yeah,

13  I need counseling.  I may need medication to help me function

14  normal -- help me function normal.  If I ever do get back out in

15  society, I may.  And I may not need medication.  But --

16          THE COURT:  Do you currently take any type of

17  psychological medication?

18          THE DEFENDANT:  When I was at Salem, the doctor, he

19  thought I needed some.  I was taking, I think, Vistaril -- Vistaril

20  and lithium for, like --

21          THE COURT:  Vistaril, were you taking Vistaril?

22          THE DEFENDANT:  Yes, Vistaril.

23          THE COURT:  Vistaril.  Okay.

24          THE DEFENDANT:  Vistaril and --

25          THE COURT:  Lithium.

1    THE DEFENDANT:  Lithium, for anxiety, stress, depression.

2    You know, I'm taking medication for that type thing.

3    THE COURT:  But when -- are you still taking those?

4    THE DEFENDANT:  No, I quit, because I don't like -- I

5    don't like feeling -- I have been resisting taking -- I have been

6    told that -- I have had a lot of doctors tell me, "You need

7    medication.  You have got a chemical imbalance in the brain.  Your

8    brain needs a certain salt.  If not, you are not functional."  I

9    don't have a lot of -- and I have been civil committed a lot of

10   times too.  And I have had a lot of doctors tell me that I have got

11   a chemical imbalance in the brain.  But --

12   THE COURT:  But none of the medications that you have

13   taken in the past have appeared to necessarily help you, have they?

14   THE DEFENDANT:  The only thing that medication has done,

15   I mean, is make me feel sleepy, heavily sedated, sleepy.  That's

16   why I have been resisting taking medications all of these years,

17   because I feel -- I feel abnormal.  If I'm taking medications, I

18   don't feel normal, like a normal person.

19   THE COURT:  Are you being held currently at the Abingdon

20   facility?

21   THE DEFENDANT:  Yes.

22   THE COURT:  Southwest -- how long have you been there?

23   THE DEFENDANT:  A few -- a few weeks or something.

24   THE COURT:  A few weeks.  Okay.

25   Since you have been housed at Abingdon, you haven't taken

1    any medication?

2            THE DEFENDANT:  I stopped taking it when I was at the

3    other jail --

4            THE COURT:  While you were in Salem.  I understood you a

5    moment ago say you stopped taking -- you stopped taking the

6    medication while you were in Salem; is that correct?

7            THE DEFENDANT:  But the psych lady at the jail right now,

8    she wanted me -- she wanted me to take some.  She advised me to

9    take some.  But I told her I didn't need it or I didn't want it or

10   whatever.

11           THE COURT:  Okay.  Now, that brings me to my next

12   question.  Are you receiving some psychological counseling at the

13   facility at Abingdon?

14           THE DEFENDANT:  Not really, not no counseling.  They

15   check on me periodically, now and then, to see if I'm -- they ask

16   me certain questions, like, you know, "Are you okay?"  "Are you

17   feeling suicidal?"  "Are you this and that?"  I mean, I have been

18   on watch a few times there.  A couple weeks ago I used my teeth to

19   -- I used my teeth to try to cut myself, my canines or whatever.

20           THE COURT:  I understand that, Mr. Cox.  I was told that,

21   yes.

22           THE DEFENDANT:  You heard -- they told you that?

23           THE COURT:  Yes, sir.  Believe it or not, because I'm

24   responsible for the folks who are in custody, I usually hear if

25   there's a problem.

```
 1              And let me ask you, can you tell me why you did that?
 2              THE DEFENDANT:  I was -- I just -- I get to the point
 3    sometimes -- I get so stressed out.  I get to the point where I'm
 4    just so ashamed -- ashamed of myself that I just -- I start hurting
 5    myself.  And I just -- I get real depressed and -- I mean -- I
 6    mean, look at the last time, when I was in Springfield, Missouri,
 7    prison, I was going down the stairway, I punched through a window.
 8    You know, they had the chicken wire?
 9              THE COURT:  Yes, sir.
10              THE DEFENDANT:  That's part of the reason why they sent
11    me to a USP, because I was real violent, kind of hostile, violent
12    or whatever, aggressive.  But, anyway, I was going down the
13    stairway and I punched through the -- it was like a square window
14    and it had a chicken wire going through it.  And I punched through
15    it.  I was so mad.  And when I feel this way, I punch through
16    stuff, glass.  I break things.  And my arm went all of the way
17    through the window.  So my arm is, like, stuck like this.  And so I
18    had to extend my arm out, slowly, I had to extend it out and pull
19    it.  And it hit a main artery, right here.  It hit a main artery.
20    Luckily, it nicked a main artery.  But I almost bled out in
21    Springfield, Missouri --
22              THE COURT:  Well, let me ask you, are you taking any
23    medications currently, at all, for any health reasons or otherwise?
24              THE DEFENDANT:  Well, right now I'm taking a little
25    -- some kind of aspirin or something for this, like a pain aspirin
```

1 or something.

2        THE COURT:  Okay.  Like Tylenol or something?

3        THE DEFENDANT:  Yeah, something like that for --

4        THE COURT:  Are you taking any type of antibiotic

5 medication to prevent infection?

6        THE DEFENDANT:  Well, I was for a little bit --

7        THE COURT:  But that --

8        THE DEFENDANT:  They stopped that because --

9        THE COURT:  Any other medications or drugs or pills in

10 the last 24 hours?

11        THE DEFENDANT:  Not -- not as far as -- not as far as

12 mental health or nothing.  Just --

13        THE COURT:  Well, I'm asking any.  Do you take --

14        THE DEFENDANT:  Just for -- aspirin for the arm.

15        THE COURT:  Have you been able to consume any alcohol in

16 the past 24 hours?

17        THE DEFENDANT:  Oh, no, ma'am.  I kind of wish I could,

18 but, on the contrary, I can't.

19        THE COURT:  Well, it is not allowed in the facilities,

20 but that doesn't mean it is not available in the facilities.

21        THE DEFENDANT:  Oh, well, where they got me at -- they

22 have got me in an isolated cell.  So where they got me at, I'm in,

23 like, a mental health type thing, so I'm not, like, in the regular

24 population where they make hooch or wine or moonshine or whatever.

25        THE COURT:  Now, we talked a lot about your mental health

1    issues.  Do you have any physical health problems?

2            THE DEFENDANT:  Yeah.  I'm nearsighted real bad.  My eyes

3    are -- my eyesight is deteriorating real bad right now.

4            THE COURT:  Any other physical health problems?

5            THE DEFENDANT:  My back, I got scoliosis -- what do you

6    call it, scoliosis in my back --

7            THE COURT:  Scoliosis in your back?

8            THE DEFENDANT:  Yes.  A curve, a curve in my back.  I got

9    scoliosis real bad in my back.  I got real bad back pains a lot.

10   The side of my neck aches.

11           THE COURT:  But you don't take any medication for that

12   other than, say, over-the-counter Tylenol or something like that?

13           THE DEFENDANT:  I have been trying to talk to -- last

14   time I was -- I was in a cell, I was trying to talk to orthopedic,

15   an orthopedic doctor to see -- check my back out; you know, either

16   x-ray or check my back out.  But by the time I tried to get it

17   checked out, they transferred me --

18           THE COURT:  Well, there's a good chance you'll be

19   transferred back to Salem, so you'll have an opportunity to follow

20   up on that.

21           THE DEFENDANT:  Because I was trying to get it checked

22   out, because it has been getting worse.  I have been having real

23   bad aches, like, in my -- underneath my shoulder blades and stuff

24   and real bad aches.  And it has kind of been affecting my balance a

25   little bit when I walk.

1        THE COURT:  Well, make sure -- especially if you change

2   facilities, Mr. Cox, make sure you make them aware that you would

3   like to see the physician with regard to that.  Okay?

4        THE DEFENDANT:  Then I have real bad aches like right in

5   here.  I don't know if it is -- it is right on the side of my neck.

6   I don't know if it is my optical nerve, my optical nerve or what.

7   But sometimes I get real bad aches.  And I squint a lot.  It might

8   -- it might be something to do with my eyes, you know, with my bad

9   vision.

10        THE COURT:  Have you ever worn prescription glasses?

11        THE DEFENDANT:  Oh, yeah.  The last -- the last ones I

12   had, when I was at Red Onion, I used to cut myself with.  I broke

13   them and I used the screws --

14        THE COURT:  And so they took them away from you?

15        THE DEFENDANT:  Yeah -- well, they were broken, so they

16   were confiscated, because I used them to cut -- I used the metal

17   screws to cut --

18        THE COURT:  Well, that's part of the problem, Mr. Cox.

19   If you insist on continuing to harm yourself, we really can't

20   provide you with eyeglasses to help with your vision problems if

21   you are going to use that on yourself.  You understand that, don't

22   you?

23        THE DEFENDANT:  Oh, yeah.  They told me the same thing

24   with the spoon -- right now I'm on finger food because --

25        THE COURT:  Because you used the utensil to harm --

1          THE DEFENDANT:  Yeah, the spork, I used the spork to cut

2   myself one time with.  So they are like -- U.S. Marshals told us

3   -- that's what the psych lady told me, she said the U.S. Marshals,

4   the feds, told us not to give, you know -- for the time being --

5          THE COURT:  And you understand why that has been done?

6          THE DEFENDANT:  Yeah, it is for my -- they say it is for

7   my safety.  But I really don't think they care, because -- I mean,

8   a couple weeks ago I used my teeth to cut myself.  And I done that

9   a couple times already.  I used my teeth.  And then when I was in

10  the jail down there, he had me in a room without a camera and then

11  with a trash bag -- a trash bag over the window and rarely check up

12  on me.  And then when I bit into myself, I was like, "Well, you-all

13  wasn't checking up on me.  You are supposed to have me on 15-minute

14  watch, but you-all wasn't watching me, supervising me.  You had me

15  in a cell without a camera.  And you had a trash bag over the door,

16  not even" -- "over the window, obscuring the window.  How is that a

17  suicide watch?"

18         THE COURT:  Let me talk just a moment to you about the

19  charges in the case.  Just a moment ago you told me what you had

20  done.

21         THE DEFENDANT:  Sorry.  I didn't mean to get all --

22         THE COURT:  No.  That's okay.

23         But do you believe that you have had an adequate

24  opportunity to go over the indictment, the written charges against

25  you in the case?  Have you seen the superseding indictment?

1          THE DEFENDANT:  Yeah.  I read -- I read the motion for

2   discovery.  I read -- I even read a little bit -- what she put in

3   the evaluation.  You know, Brian Beck -- when Brian Beck had me, he

4   showed me the charges and the evidence.

5          THE COURT:  Do you believe you have had an adequate

6   opportunity to speak with your attorney regarding the charges and

7   regarding your case in general?

8          THE DEFENDANT:  Oh, of course.  Of course.  Of course.

9          THE COURT:  Now, you are -- you have not entered into a

10  plea agreement with the government; correct?  There's no plea

11  agreement in this case.  You haven't signed a plea agreement with

12  the government.

13         THE DEFENDANT:  Oh, no.  I just want -- I just want to

14  take responsibility -- responsibility of what I did and just go

15  ahead and plead guilty, because, in fact, I'm guilty anyways,

16  because, I mean, I read the motion of discovery and evidence that

17  is brought against me.  And I know I'm wrong.  I know I'm wrong

18  too --

19         THE COURT:  Well, I understand that, Mr. Cox.  But let me

20  just ask you this:  You understand that you do have the option to

21  have your attorney speak to the government and see if the

22  government is interested in entering into plea negotiations?  Do

23  you understand that's an option for you in the case, that you

24  -- nobody is requiring you in any way to plead guilty at all, much

25  less without the benefit of a plea agreement?  Do you understand

1   that?

2            THE DEFENDANT:  Oh, yeah.  Nobody is putting -- nobody is

3   putting a gun to my head saying, "You," you know, "sign this.

4   We're going to take this plea or we're going to shoot you with a 9

5   millimeter."  Nobody is doing that.

6            THE COURT:  Okay.

7            THE DEFENDANT:  Nobody is forcing --

8            THE COURT:  Well, I'm going to ask you some more

9   questions with regard to that in a moment.  But I just want to make

10  sure that you understand that there are other options available,

11  including allowing your counsel to negotiate with the government

12  with regard to what might be an appropriate plea agreement in the

13  case.  Do you understand that that is an option?

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  And do you understand that if you didn't

16  plead guilty today, you could allow -- you would have time, prior

17  to your trial, to allow your counsel to do that?  Do you understand

18  that?

19           THE DEFENDANT:  Yes, ma'am.

20           THE COURT:  Now, apparently at some point you were in

21  some way dissatisfied or you had some concerns, because earlier

22  today you asked to withdraw a motion to have your counsel removed

23  from the case; correct?

24           THE DEFENDANT:  Yes.

25           THE COURT:  All right.

1          THE DEFENDANT:  I don't even know her.  I mean, I just

2    -- I know -- I'm aware I just got her, too.  It is part of my

3    paranoia to -- because at first I didn't think she was really

4    trying to represent me to the best of her ability or, you know,

5    really cared, you know.

6          THE COURT:  But I guess what I want to ask you is this:

7    Your representation by Mr. Beck and Ms. Dickenson, today, as you

8    sit here, do you -- are you dissatisfied in any way?

9          THE DEFENDANT:  Nah.  I'm dissatisfied with Beck, but

10   -- but I'm not --

11         THE COURT:  You are not dissatisfied with Ms. Dickenson's

12   representation -- with her representation?

13         THE DEFENDANT:  All she has been trying to do is help me.

14   And sometimes you -- sometimes you have got to let somebody try to

15   help -- try to help you.  I mean -- and I haven't been giving -- I

16   haven't been giving her that chance.

17         THE COURT:  Well, let me ask you this.  Do you believe

18   -- I want to make sure that you understand that there's no rush,

19   that there's no reason you have to plead guilty today.  You

20   understand that you have additional time prior to your trial and

21   that you won't be prejudiced in any way -- as long as by the time

22   of your pretrial conference, about two weeks prior to your trial,

23   if you announce at that time you are going to plead guilty, there

24   would be no prejudice to you in any way to wait?  Do you understand

25   that?

```
1            THE DEFENDANT:  Yes, ma'am.

2            THE COURT:  But it is your desire to go forward today

3    with your guilty plea?

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  And you understand that's being done without

6    the benefit of a plea agreement?

7            THE DEFENDANT:  Yes, ma'am.

8            THE COURT:  Now, has anyone made any promises to you in

9    an effort to persuade you to plead guilty?

10           THE DEFENDANT:  No, ma'am.

11           THE COURT:  Has anyone made any threats or in any way

12   tried to force you to plead guilty?

13           THE DEFENDANT:  No, ma'am.

14           THE COURT:  Do you in any way feel compelled to enter a

15   guilty plea in this case, other than making your own decision that

16   that is what you would like to do to resolve these charges?

17           THE DEFENDANT:  No, ma'am.  I don't feel compelled.

18   Compelled means you don't feel --

19           THE COURT:  That you are not making your own free

20   decision.

21           THE DEFENDANT:  Nah, I just -- I feel this is the way I

22   strongly feel, that this is the right thing for me -- for me to do,

23   take --

24           THE COURT:  Ms. Dickenson, let me talk to you just a

25   moment.  And, you know, I have Mr. Cox's psychological report.  And
```

```
 1    Mr. Cox does have a lengthy history, at least, of different

 2    psychological diagnoses, treatment.  You know, he has exhibited

 3    self-mutilating behavior in the past, even while he has been in

 4    federal custody.

 5            But I guess I want to speak to you just a moment.  I mean

 6    today, here in the court, Mr. Cox seems to me that he understands

 7    the charges against him.  We're going to go forward in a moment to

 8    make sure he understands the consequences of pleading guilty to

 9    those charges.  But it seems to me that he is making the decision

10    that he wishes to enter a guilty plea without the benefit of a plea

11    agreement.

12            I guess while I -- I don't want to ask you if you have

13    concerns over his competency, because I think it would be crazy for

14    anyone to say they don't have concerns over his competency based on

15    the history.  But I guess what I would just ask from you is do you

16    have any reason to suspect he's not competent to understand the

17    charges against him or the consequences of pleading guilty to those

18    charges or the nature of today's proceedings in any way?

19            MS. DICKENSON:  Your Honor, in response to the Court's

20    inquiry, I do believe that Mr. Cox understands the charges against

21    him.  He has reviewed the discovery.  He has made references to me

22    about the contents of our discovery notebook that Mr. Beck reviewed

23    with him in months past, so I know that he has historical

24    recollection.

25            THE COURT:  He seems to have a high intelligence level.
```

1        MS. DICKENSON:  He is oriented to time and place.  So I

2   do not have -- I believe that Mr. Cox is competent to proceed to

3   trial.  I also believe that Mr. Cox suffers from a severe mental

4   illness.

5        THE COURT:  And I know that that's a different finding

6   than held by the evaluators when he was evaluated, because,

7   basically, the evaluators basically found that -- the evaluator

8   found that he suffers from antisocial personality disorder and a

9   -- I forget the other personality disorder --

10       MS. DICKENSON:  I guess the language that is important in

11  the June 16th letter from doctor -- or from the warden stating that

12  the examiner found that it is the opinion of the examiner that

13  Mr. Cox did not suffer from a mental illness, quote, that

14  interfered with his ability to appreciate the nature and quality or

15  wrongfulness of his actions.

16       So I just suppose -- I agree with that statement, in my

17  layman's --

18       THE COURT:  The diagnosis was a borderline personality

19  disorder and an antisocial personality disorder.  And, I mean, I

20  think personality disorders can have a significant effect on how

21  you live your life, but may not be the type of mental illness that

22  makes an individual unable to understand the nature of the

23  proceedings against him or the charges or the consequences of

24  pleading guilty to those charges.  That's what I hear that you are

25  saying to the Court?

1          MS. DICKENSON:  Correct, Your Honor.

2          THE DEFENDANT:  I mean, Ms. Feldman, I talked to her.

3   She didn't think I was psychotic or not real severe or nothing like

4   that.  I talked to her, Dr. Feldman --

5          THE COURT:  Well, and her report reflects that, Mr. Cox.

6   But you have to understand my concern based on your actions at

7   least while you have been in federal custody.  My concern is this,

8   that justice is done.  And my concern is that a person -- I do not

9   want a person who is not guilty of the charges pleading guilty to

10  charges he's not guilty of, first and foremost.  And I don't want

11  you pleading guilty for any other reason than you are making a free

12  decision, knowingly and voluntarily, to do so.  I want to make sure

13  that you don't feel compelled in any way, by any of your mental

14  illness or any of your prior mental health symptoms, to do so.

15          Now, let me just -- I have a few more questions for you.

16  Okay?  I want to make sure that you understand that the charges to

17  which you are pleading guilty are felonies.  And if your plea is

18  accepted, you will be found guilty of those charges.  And this may

19  deprive you of certain valuable civil rights, such as the right to

20  vote, to serve on a jury, to hold public office, and to possess any

21  kind of firearm.  Do you understand that?

22          THE DEFENDANT:  Yes, ma'am.  But that only lasts for five

23  years, don't it?

24          THE COURT:  No, sir, it doesn't only last for five years.

25  It would last until those rights are restored --

1        THE DEFENDANT:  Ain't they like -- because I thought a

2   person has, like, a certain amount of years, clean conduct, where

3   it is cleared?

4        THE COURT:  No, sir.

5        THE DEFENDANT:  Five or ten years?

6        THE COURT:  Once your civil liberties are removed from

7   you, you may have to petition to get them restored or they may be

8   restored.  But there's no period of time after which they are

9   magically restored.  And I want to make sure you understand this.

10        Your right to possess a firearm, even though you have a

11   right to petition to have that reinstated, I do not know that the

12   federal government is allowing any convicted felons a restoration

13   of their firearm rights.  I have never heard of that ever being

14   allowed before.  Okay?

15        THE DEFENDANT:  Well, especially if I have threats -- I

16   made those kind of threats, I mean, I don't think they will trust

17   me with a gun anyway.

18        THE COURT:  But I want to make sure that you understand

19   that that's one of the consequences of pleading guilty to felony

20   charges.  Do you understand that?

21        THE DEFENDANT:  Yes, ma'am.

22        THE COURT:  And do you now understand that there's no

23   period of time at which these rights would be magically restored to

24   you?  To get them restored, you would have to have either a

25   presidential and/or a pardon by various state authorities,

1  governors, perhaps.

2          THE DEFENDANT:  A senator?

3          THE COURT:  No.  In most states, if you have state

4  charges, it would take a pardon by the sitting executive, which

5  would be the governor of the state.  And on federal charges, it

6  would take a pardon by the President of the United States.

7          THE DEFENDANT:  Oh, to be able to vote again or --

8          THE COURT:  To be able to possess a firearm again or to

9  restore any of these civil liberties, unless there could be orders

10  entered restoring your civil liberties, to allow you to vote, but

11  you might have to petition to have that done.  Do you understand

12  that?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  Okay.

15          Ms. Kerney-Quillen, can you advise me?  Do you have a

16  copy of the datasheet there?  The charge to which -- Mr. Cox faces

17  five charges of the same offense.  Do you have the maximum possible

18  penalties that may be imposed?

19          MS. KERNEY-QUILLEN:  I do, Your Honor.

20          With regards to each count, it is a term of imprisonment

21  of not more than 10 years, a fine of up to $250,000, and a term of

22  supervised release of not more than three years.

23          THE COURT:  Okay.

24          Now, the maximum penalty -- you face five charges of

25  violating Title 18, United States Code, Section 860 -- I'm sorry,

1    876, I believe it is (c), 876(c).  The maximum possible penalty

2    that could be imposed on each of those counts is up to 10 years'

3    imprisonment, a fine of up to $250,000.  There could be -- there

4    would be a special assessment of $100 per count.  And there could

5    be a period of supervised release of up to three years imposed on

6    each charge.  Do you understand the maximum penalties?

7                THE DEFENDANT:  Yes, ma'am.

8                THE COURT:  I want to make sure that with regard to the

9    supervised release that you understand that that is a period of

10   supervision that would follow any term of imprisonment.

11               You have been on supervised release before; correct?

12               THE DEFENDANT:  Oh, one minute.  You said that for these

13   five felonies that I could get no more than 10 years or --

14               THE COURT:  You could get no more than 10 years on each

15   charge.  So it could be possible that you could get up to 50 years

16   in prison total, because you are charged with five counts.

17               THE DEFENDANT:  Oh, okay.  I thought -- I thought -- five

18   felonies, I thought it was just 10, 10 for --

19               THE COURT:  It could be up to 10 years on each count.  Do

20   you understand that?

21               THE DEFENDANT:  Oh, okay.  Different felonies.  Okay.  It

22   is five different felonies.

23               THE COURT:  Yes, sir.  Five different felony counts.

24               THE DEFENDANT:  Oh.  For each one they could hit me with

25   10 years, if they wanted to?

1        THE COURT:  It is possible.  And I have to make sure that

2   you understand that that is the maximum possible penalties.  Do you

3   understand that?

4        THE DEFENDANT:  Yes, ma'am.

5        THE COURT:  Now, I want to talk to you about supervised

6   release.  You have been on a term of supervised release in federal

7   court before; correct?

8        THE DEFENDANT:  Yes, ma'am.

9        THE COURT:  And you understand that that is a period of

10  supervision that would be imposed after you served any term of

11  incarceration that may be imposed?  Do you understand that?

12       THE DEFENDANT:  Yes, ma'am.

13       THE COURT:  Do you further understand that if you were to

14  violate any terms of your supervised release, the court could

15  revoke that period of supervision and could incarcerate you to an

16  additional period regardless of how much time may have been served

17  previously?  Do you understand that?

18       THE DEFENDANT:  Are you talking about the time -- the

19  time that is over my head, the time that would be over my head --

20       THE COURT:  For instance.

21       THE DEFENDANT:  -- probation --

22       THE COURT:  -- in this case, if the judge were to

23  sentence you, let's say, to 10 years' imprisonment and a term of

24  three years supervised release, do you understand that it could be

25  possible -- if you finished your term of imprisonment, you were

1   released on supervised release, but you violated a condition of

2   your supervised release, do you understand that it could be

3   possible for the judge to impose an additional prison term on you

4   as a result of a violation of your supervised release?

5           THE DEFENDANT:  That's what happened last time.

6           THE COURT:  Exactly.

7           THE DEFENDANT:  I was on two years' supervised --

8           THE COURT:  And I want to make sure that you understand

9   that that could be done again.  Do you understand that?

10          THE DEFENDANT:  So if you have got 20 years over my head,

11  supervised, and I violated, because I violated on purpose or

12  whatever -- say I go out there and -- like I did last time and

13  commit a new crime or whatever, that they can give me 20 years --

14          THE COURT:  Or they can --

15          THE DEFENDANT:  -- that is over my head or --

16          THE COURT:  You need to understand that in federal court

17  you won't have a suspended sentence like you might have gotten in

18  state court.

19          THE DEFENDANT:  Well, no, the two years that I had on my

20  federal probation -- I had two years over my head.  The last time I

21  got out I had two years.  And when I violated, they gave me -- they

22  gave me the two years that I had on supervised release --

23          THE COURT:  Yes.  And I want to make sure you understand

24  that that could be done again.

25          THE DEFENDANT:  Yes, ma'am.

```
 1              THE COURT:  Do you understand that?

 2              THE DEFENDANT:  Yes, ma'am.

 3              THE COURT:  Now, do you believe, Mr. Cox, that you

 4   understand all of the possible consequences of your plea?

 5              THE DEFENDANT:  Yes, ma'am.

 6              THE COURT:  Have you and Ms. Dickenson talked about the

 7   sentencing guidelines and their effect on any sentence that may be

 8   imposed in your case?

 9              MS. DICKENSON:  Your Honor, I have not discussed the

10   sentencing guidelines with Mr. Cox.  I believe Mr. Beck had

11   considerable negotiations --

12              THE COURT:  Talked about that --

13              MS. DICKENSON:  -- excuse me, a long conversation with

14   Mr. Cox about the sentencing guidelines during the time of the

15   negotiations previously regarding a proposed plea agreement.

16              THE COURT:  Is that correct, Mr. Cox?

17              THE DEFENDANT:  Yes, ma'am.

18              THE COURT:  You and Mr. Beck spoke about them?

19              THE DEFENDANT:  Yes, ma'am.

20              THE COURT:  Do you understand that what normally occurs

21   under the sentencing guidelines is the judge must select a sentence

22   from within a guideline range, and that that guideline range will

23   not even be determined until after a presentence report has been

24   completed and a sentencing hearing is held?  Do you understand that

25   only then will the judge actually determine what the guideline
```

1   range should be?

2          THE DEFENDANT:  Yes, ma'am.

3          THE COURT:  Do you further understand that once the

4   guideline range is determined, that the judge has the authority in

5   some circumstances to depart from the guidelines and impose a

6   sentence that is either less severe or more severe than that called

7   for by the guidelines?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  And do you further understand that the

10  sentencing guidelines are no longer mandatory and the judge --

11  after considering the guidelines and considering the factors listed

12  under Title 18, United States Code, Section 3553(a), that the judge

13  may sentence outside the guidelines and up to the statutory maximum

14  penalties that I advised you of earlier?

15         THE DEFENDANT:  Yes, ma'am.

16         It is like vice versa.  He can either give me more

17  -- more time or less.  It is pretty much up to the judge.

18         THE COURT:  In essence, the judge may sentence you

19  anywhere up to the statutory maximum penalties; you understand

20  that?

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Do you understand that parole has been

23  abolished and that if you are sentenced to prison, you will serve

24  your full term of imprisonment, less any credit the Bureau of

25  Prisons may give you for good time or for good behavior?

1          THE DEFENDANT:  That's what they did the last time.  But

2    they still got -- they still got a mandatory probation, supervised

3    -- under the new law, they have still got --

4          THE COURT:  Well, they have supervised release, is what

5    we call it now.  We no longer call it parole.  You are released on

6    supervised release.  That's why I went over that with you a moment

7    ago.

8          THE DEFENDANT:  That's what they did the last time with

9    me.

10          THE COURT:  Do you understand that any sentence that may

11    be imposed by Judge Urbanski in this case may be different from any

12    estimate your attorneys have given you, any estimate the attorney

13    for the government may have given you, or even any estimate that

14    may have been given to you by the United States Probation Office?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  Do you understand that sentencing rests in

17    the sole discretion of the district court judge?  You understand

18    that?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  I want to make sure that you understand that

21    you are waiving or giving up a number of rights by pleading guilty.

22    I want you to understand that you have the right to plead not

23    guilty.  You have the right to persist in that plea.  You have a

24    right to go to a trial by a jury.  At that trial you would be

25    presumed innocent and the government would have to prove your guilt

1    beyond a reasonable doubt.  You would have the right to have the

2    assistance of your counsel at trial.  You would have the right to

3    see, hear, and have your counsel cross-examine any of the

4    government's witnesses.  You would have a right to testify

5    yourself, if you chose to do so.  You would have the right to call

6    witnesses to testify in your behalf.  And if those witnesses did

7    not appear, you would have the right to have the court compel them

8    to appear by the issuance of subpoenas.

9           You would further have the right, if you chose not to do

10   so, not to testify.  And that's an absolute right.  No one can

11   force you to testify.  And the fact that you did not testify or the

12   fact that you did not put on any evidence could not be used against

13   you.

14          Now, do you understand, Mr. Cox, that you have these

15   rights?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  And do you further understand, by entering a

18   plea of guilty, that you are waiving your right to trial and all of

19   these rights associated with your right to trial?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  Ms. Kerney-Quillen, would you like to

22   -- would you like to proffer the evidence the government would show

23   if the case went to trial, so I can make sure there's an adequate

24   basis in fact to support the charges against Mr. Cox?

25          MS. KERNEY-QUILLEN:  Yes, Your Honor.

1          Your Honor, in this case Mr. Cox was an inmate who was

2    serving a state sentence at Red Onion State Prison, in Wise County,

3    Virginia, which is in the Western District of Virginia.

4          During the period of time from 2003 until October 26th,

5    2015, Mr. Cox mailed three threatening letters to federal judges

6    and prosecutors in Virginia, Missouri, and Texas.

7          THE COURT:  Ms. Kerney-Quillen, I think you stated 2003.

8    But that was between the period of 2013 and 2015; is that correct?

9          MS. KERNEY-QUILLEN:  That is correct, Your Honor.  Yes.

10   I apologize.

11         THE COURT:  That's fine.

12         MS. KERNEY-QUILLEN:  Thank you for catching that, Your

13   Honor.

14         There was a 2003 letter that he wrote, but he was

15   previously prosecuted for that in the Eastern District of Virginia.

16   And that was the letter that Mr. Cox referenced a little earlier

17   with regards to threatening former President Bush.

18         The letters that Mr. Cox wrote that are the subject of

19   this prosecution are between August the 30th of 2013 to October

20   22nd of 2015 for the first batch of letters.  And those three

21   letters did contain threats to prosecutors and United States judges

22   in Texas, Missouri, and Virginia.

23         The first letter, which was received in the Houston

24   United States Federal District Court clerk's office on August the

25   30th, 2013, was addressed to judges and prosecutors.  Although no

1    specific individuals were named, the letter did state that -- he

2    did make reference to these threats to judges and prosecutors five

3    times within that letter.  The letter threatens to kill judges and

4    prosecutors and to blow up the court building.  The letter was also

5    covered in a substance that appeared to be blood.

6         The letter -- I will not read it in its entirety, Your

7    Honor, but it just states -- portions of it state, "I'm coming for

8    all of you judges and prosecutors.  I'm going to blow you up.  I'm

9    going to blow your houses up.  I'm going to blow your courthouse

10   up.  I'm going to kill you.  I'm going to do this for what you have

11   done for locking up Americans.  It is judgment day for you.  All

12   hell is going to break loose.  Sincerely, James Cox."

13        The next letter was postmarked April the 29th, 2015.  And

14   it was addressed to the Honorable Nanette Laughrey, United States

15   Judge for the United States District Court for the Western District

16   of Missouri.  That letter did specifically address a specific

17   individual, Judge Nanette Laughrey.  The letter makes numerous

18   threats to rape and kill Judge Laughrey.  And the letter is not

19   signed.  But the return address on that envelope listed James Cox,

20   inmate number 1066187, Red Onion State Prison.

21        The next letter was postmarked October the 22nd, 2015.

22   And the envelope was addressed to the United States District Court

23   for the Eastern District of Virginia.  The letter was not addressed

24   to any specific judge, but it opened with a statement, "I'm sitting

25   here premeditating how I'm going to kill you judges when I get

out."  That letter made numerous threats, again, to kill, rape, and
sodomize judges in explicit detail.  And the judge -- the letter
did make specific reference to judges twice throughout the letter.

The defendant's letter from that date states that he's
going to shoot the judges, take a knife and peel their faces off,
make masks out of their faces, pluck out their eyes, drink their
blood, conduct a human sacrifice, and other references to how he's
going to kill, rape, and sodomize those judges.  That letter was
signed by James Cox.  And it included Mr. Cox's DOC inmate number,
1066187.

Following the receipt of those letters, on November the
10th, 2015, FBI Special Agent Paul Gray interviewed Mr. Cox at Red
Onion State Prison in Pound, Virginia, along with Virginia
Department of Corrections Investigator Jessie Wagner.  The
interview was audio-recorded.  And a copy was provided to defense
counsel along with discovery.

In that interview Mr. Cox was *Mirandized* and agreed to
waive his *Miranda* rights and speak with the officers.

Agent Gray showed Mr. Cox each of the three letters.  And
Mr. Cox admitted that he had written each of the letters.

With regards to the first letter, in 2013, Mr. Cox stated
that he had put drops of his own blood on that letter prior to
placing it in the mail, and that he had done so because it felt
good when he put the blood on the letter and that it was a
fascinating and emotional release for him to do so.

1           In addition to admitting that he wrote each letter,

2    Mr. Cox stated that he has homicidal feelings towards each letter's

3    recipients.  He advised that he meant what he wrote in the letters

4    concerning killing the recipients and that he has ill feelings and

5    homicidal feelings and will probably carry out the killings of the

6    officials he described in the letters.  He also added that he has

7    thoughts of killing his own family members when he's released from

8    prison, as he has a lot of anger and bitterness.

9           Mr. Cox again elaborated on his continued anger towards

10   President Bush and that he still has intentions to kill former

11   President Bush.  And he noted that President Bush currently has

12   less security and that he will be easier to kill now.

13          Mr. Cox added that he has these homicidal thoughts

14   further caused from his childhood and that he has previously had

15   homicidal tendencies towards his family, including a desire to stab

16   his family to death and cut their hearts out while they were

17   sleeping.

18          Despite these thoughts and the elaboration that he made

19   with regards to his homicidal tendencies, Mr. Cox told the officers

20   that he is tired, but not crazy, and reiterated that his feelings

21   towards the letters -- the people in the letters is not going to

22   change and that he still plans to carry out his plans to kill these

23   individuals should he be released from prison.

24          After Mr. Cox was indicted on these charges with regards

25   to the first three letters, two additional letters postmarked June

1  the 6th, 2016, were sent to counsel for the defendant and the

2  United States Attorney's Office by the United States District Court

3  clerk's office for the Western District of Virginia.  Those were

4  received via email on June the 8th, 2016.  These letters were then

5  forwarded to the FBI.  The two new letters were postmarked June the

6  6th, 2016.

7          The first was an envelope addressed to United States

8  District Court with a letter inside that was addressed to Judge

9  James Jones.  The letter contained numerous threats to kill Judge

10  James Jones as well as Donald Trump.  And that letter, in addition

11  to making these numerous threats to kill Judge Jones and Donald

12  Trump, is signed by James Cox.  And it was stamped on the back that

13  it had been mailed from the Southwest Virginia Regional Jail.

14          The second letter was also postmarked June the 6th, 2016.

15  It was also in an envelope addressed to the United States District

16  Court, containing a letter inside addressed to Judge James Jones.

17  That letter also made threats to kill Judge Jones.  In addition,

18  that letter states that Mr. Cox plans to collaborate and conspire

19  with his ISIS Muslim brothers to blow up Judge Jones' house and

20  further elaborates as to how he's going to kill and dismember Judge

21  Jones' body.  That letter, again, was signed by James Cox and it

22  was stamped that it had been mailed from the Southwest Virginia

23  Regional Jail.

24          Following receipt of these letters, Special Agent Gray

25  again interviewed Mr. Cox, along with Deputy U.S. Marshal Jim

1    Satterwhite on June the 8th, 2016.  Mr. Cox was again *Mirandized*

2    and agreed to speak with the officers concerning the two additional

3    letters written in 2016.

4            Mr. Cox admitted that he had written both of those

5    letters.  He advised that he wrote the first letter containing the

6    threats to Judge Jones and Donald Trump on Friday, June the 3rd,

7    2016, and that he had written the second letter on June the 5th,

8    2016.  He admitted that he had placed both letters into the

9    outgoing United States Mail at the jail where he's incarcerated,

10   that he had signed both letters.  And he identified his signature

11   on both of those letters.

12           Mr. Cox again advised both of the officers that he wrote

13   the letters because of his depression and sadness and release of

14   emotions, yet he advised that he did plan to carry out his

15   homicidal thoughts and tendencies and that he meant what he said in

16   each of the letters containing threats to Judge Jones and Donald

17   Trump.  He did state that he advised he would kill Judge Jones and

18   Donald Trump if he is released from prison.

19           Your Honor, all of the individuals who are identified by

20   Mr. Cox in these five letters, the judges and prosecutors, are all

21   -- they are all officials who are covered under United States Code,

22   Section -- 18, United States Code, Section 1114.  They are either a

23   United States judge or federal law enforcement official or other

24   official otherwise covered under United States Code, Section 18

25   -- 18 USC Section 1114.  And, again, all five of these letters were

1    written within the Western District of Virginia.  And Mr. Cox did

2    admit that he wrote each of the letters.

3              THE COURT:  All right.  Thank you.

4              MS. KERNEY-QUILLEN:  Thank you, Your Honor.

5              THE COURT:  Mr. Cox, let me ask you.  You have heard the

6    facts that the government says it could prove if the case went to

7    trial.  Do you have any dispute with those facts, sir?

8              THE DEFENDANT:  No, ma'am.

9              THE COURT:  Then let me ask you at this time, how do you

10   wish to plead to the charges contained in Counts One through Five

11   of the superseding indictment:  guilty or not guilty?

12             THE DEFENDANT:  Guilty.

13             THE COURT:  Anything further, counsel, in deciding

14   whether or not to accept the plea?

15             MS. KERNEY-QUILLEN:  No, Your Honor.

16             MS. DICKENSON:  No, Your Honor.

17             THE COURT:  Mr. Cox, based on what I have heard, sir, I'm

18   going to accept your guilty pleas and recommend that the Court find

19   you guilty of these offenses.  I find that you are competent and

20   capable of entering an informed plea, you are doing so knowingly

21   and voluntarily, and that the pleas are supported by an independent

22   basis in fact.  So I'm going to accept your pleas and find you

23   -- and recommend that the Court find you guilty of the offenses.

24             Now, as I stated, a presentence report will be prepared

25   by the probation office to assist Judge Urbanski in sentencing.

```
 1   You will be asked to give information for that report.  And you may

 2   do so with the presence of your attorney or you may waive the

 3   presence of your attorney.  Okay?  Once the report has been

 4   prepared, a copy will be provided to Ms. Dickenson.  She'll come

 5   and go over the report with you.  And you'll have an opportunity to

 6   file any objections to any of the information contained in the

 7   report.

 8            Any objections, of course, counsel, should be filed in

 9   writing to the officer who prepared the report within 14 days after

10   receiving the report.

11            Before we started the guilty plea colloquy counsel

12   consulted with the clerk and have agreed to a sentencing date and

13   time of November 18th.  That will be at 2:00 p.m. before Judge

14   Urbanski in Roanoke.

15            Now, Mr. Cox, do you have any questions for the Court?

16            THE DEFENDANT:  No, ma'am.

17            THE COURT:  All right.  Mr. Cox, you'll continue to be

18   held.  You'll be brought back before Judge Urbanski on November the

19   18th.  At that date and time you'll be sentenced on the charges.

20   Okay?

21            Counsel, do you know of anything further we need to take

22   up?

23            MS. KERNEY-QUILLEN:  No, Your Honor.

24            MS. DICKENSON:  Your Honor, there are two matters.

25            One, I understand that there was a presentence report
```

1    prepared for Mr. Cox in the Eastern District of Virginia.  I would

2    ask that the Court allow counsel to have a copy of that from

3    probation.

4                THE COURT:  I will.  And I'll enter an oral order

5    allowing counsel to have -- if I haven't done that already, but I

6    will allow counsel -- I will allow the probation office, if they

7    have it, to provide that to counsel for the government as well as

8    counsel for the defense.  And that's the Federal Probation Office,

9    the Eastern District of Virginia, for his earlier Eastern District

10   of Virginia conviction.

11               And, now, is there something else?

12               MS. DICKENSON:  Yes, Your Honor.

13               Secondly, I would ask the Court direct or order the

14   Marshals Service to inform the local jail facilities where Mr. Cox

15   is held that Mr. Cox should not have access to outgoing mail or

16   stamps except to write to me.  The reason, Your Honor, is that

17   Mr. Cox has a propensity to write letters that he should not.  And

18   I believe that it is in his best interest.

19               I have consulted with Mr. Cox regarding that request.

20   And he concurs that it is appropriate that he not have access to

21   stamps and outgoing mail while he's in custody.

22               THE COURT:  Well, Ms. Dickenson, the only thing that

23   concerns me about that is that is greatly inhibiting his First

24   Amendment rights.  It is not that I disagree with you that it is in

25   his best interest that he not have access to both.

1           What I would prefer -- how I would prefer that we handle

2    this, Mr. Cox, is that it be noted that you are requesting that you

3    not have access to those.  Are you requesting that you not have

4    access to stamps to mail additional mail except for legal mail

5    coming to your counsel?

6           THE DEFENDANT:  I really -- I really don't agree with

7    that 100 percent, I mean, to be honest with you.  I just -- I just

8    -- in all reality, I have just got to quit writing these letters

9    before I get myself in more and more trouble, because, I mean --

10          THE COURT:  That's true.  That's true, Mr. Cox.  You do

11   need to quit writing these letters.

12          But, Ms. Dickenson, I think that's fairly drastic.  And

13   I'm not inclined to grant that.  Now, I'm not going to tell you

14   Judge Urbanski wouldn't, if you addressed it to him.  But I'm not

15   inclined to order that, just because, you know, I could see there

16   are so many legitimate uses for him to perhaps contact friends or

17   family or even the court.  You know, he has a right to write the

18   court, even though he's represented.

19          MS. DICKENSON:  And, Your Honor, my thought was that any

20   letters that he would direct towards friends or family could be

21   forwarded to me and I would mail those, should they be appropriate.

22          THE COURT:  Well, actually --

23          THE DEFENDANT:  That is a good idea --

24          THE COURT:  Mr. Cox, just one moment.

25          Actually, Ms. Dickenson, that actually is a violation of

1  federal law to do that.  And I discovered that years ago when I had

2  a client who was in custody who asked me to do that.  Supposedly,

3  for an inmate to basically direct mail to someone else to mail, it

4  can expose the inmate to additional charges.

5          I understand your concern --

6          MS. DICKENSON:  Your Honor, I --

7          THE COURT:  And, Mr. Cox, you know you don't need to

8  write any more of these letters.

9          THE DEFENDANT:  Exactly.  I know right and wrong.  All I

10  would say is -- yeah, because my family writes -- also, if somebody

11  in my family writes me, and then I ain't able to write them

12  because --

13          THE COURT:  Well, Mr. Cox, I'm not inclined to grant that

14  motion.  So I'm not going to deny you access -- if you have money,

15  I'm not going to deny you access to stamps or writing.

16          But, you know, sir, you know -- you are an intelligent

17  man.  I can tell from speaking to you, Mr. Cox, you are an

18  intelligent man.  I don't know fully exactly what you are having to

19  deal with emotionally and mentally.  But it is of no benefit to you

20  to write any of these letters -- any additional letters like this

21  to anyone.  Okay?

22          If you need mental health counseling, Mr. Cox, please

23  speak to a qualified mental health professional at the facility.

24  And, you know, get some counseling.  They will spend time with you.

25  But you will have to request it.

1        THE DEFENDANT:  Jim told me -- Jim told me -- he said I

2    get the urge or tendency -- urge to write one of those little page

3    of letters, write him.  He told me.  He said write him.

4        MS. DICKENSON:  And I object to that, Your Honor.

5        THE COURT:  You need to understand, Mr. Cox, that if you

6    do that, you could get charged with writing that to

7    Mr. Satterwhite.

8        THE DEFENDANT:  Well, he told me he wouldn't --

9        THE COURT:  I know he said he wouldn't.  But that doesn't

10   rest in his discretion to do that.  Okay?  That would be in the

11   discretion of the U.S. Attorney's Office.

12       There -- you know, if you get a desire to write things

13   like this, write it down and destroy it.  The crime occurs when you

14   mail them.  Do you understand that?

15       THE DEFENDANT:  Like a journal, a diary or something?

16       MS. DICKENSON:  May I interrupt?  Mr. Cox does not have

17   funds of his own.  He is using free postage to mail these letters,

18   which then consequent the charges that are -- result in the charges

19   that are brought against him.

20       THE COURT:  And of course he gets that postage because he

21   marks them as legal mail.

22       MS. DICKENSON:  Legal mail.

23       THE COURT:  Mr. Cox, you know, there's only so much I can

24   do to protect you from yourself.  Okay?  It is not wise for you to

25   continue to do this.  I don't know why you do it.  If you do it for

```
 1   the purpose which I suspect you might, in that you wish to be

 2   incarcerated further, you have accomplished that.  There's nothing

 3   to be done by writing an additional letter at this point, Mr. Cox.

 4   Okay?  But I'm not going to -- I'm not going to grant counsel's

 5   motion, because I think that would deprive you of other rights --

 6           THE DEFENDANT:  Yeah, I was kind of thinking if somebody

 7   in my family writes me, then I won't be able to write them --

 8           THE COURT:  I understand.  And I'm not going to impose

 9   any order on you that you can't do that.  Okay, Mr. Cox?

10           THE DEFENDANT:  But if I try to -- you know, because

11   -- not to try -- not to, because it is only getting me more and

12   more --

13           THE COURT:  Getting you in more trouble.  And you are a

14   smart enough man that you recognize that.

15           Now, the question is, Mr. Cox, is you have got to decide

16   whether you can control your actions or not.  Okay?

17           MS. DICKENSON:  Your Honor, I will give notice to the

18   prosecution and the Marshals Service that I intend to correspond

19   with the jails where Mr. Cox will be held, to advise them that I'm

20   requesting that he not be granted privileges for legal mail that --

21           THE COURT:  And if the jail -- if they choose to do that,

22   I'm not going to bind them not to.  I'm just not going to order it.

23           MS. DICKENSON:  I understand.  I understand the Court's

24   concerns.  And I appreciate that.

25           THE COURT:  I have great concerns.  I know exactly why
```

```
1    you are doing what you are doing.  And I agree with you it is in
2    his best interest that he doesn't.  But I just think that's a far
3    -- that's a really broad order for a court to enter.  And I'm not
4    inclined to enter that.
5              THE DEFENDANT:  Well, the FCC in Miami, they kind of
6    monitor.  They monitor mail when it is going out, like, certain
7    investigator or whatever.  They kind of -- they monitor it.  And I
8    know -- I remember when I was at the FDC, not just me, but anybody,
9    they couldn't seal it -- they couldn't seal it all of the way up.
10   You had to leave it open before they processed it through the --
11             THE COURT:  Yeah, but I'm not going to enter an order
12   with regard to that, Mr. Cox.  Okay?
13             Anything further?
14             MS. DICKENSON:  No, Your Honor.  I thank the Court for
15   its patience today in taking the pleas.
16             THE COURT:  Well, you know, my concern was to make sure
17   that Mr. Cox understands fully what he's doing.  And I feel like he
18   does.
19             Mr. Cox, I wish you the best.  The one thing I want to
20   say to you, Mr. Cox, is your self-mutilation, there's nothing to be
21   accomplished by that, sir.  Nothing.  Okay?  If you believe
22   counseling will help you, ask for that at the facility.  You are
23   likely to be transferred back to Salem to be held.  Ask for that.
24   They will provide you with that.  Okay?
25             All right.  If there's nothing further, the court will
```

1    stand in recess.

2        (Thereupon, these proceedings were adjourned at 1:03 p.m.)

3

4

5        I, court-approved transcriber, certify that the foregoing is a

6    correct transcript from the official electronic sound recording of

7    the proceedings in the above-entitled matter.

8

9

        _____/s/ Carol Jacobs White_____  ____March 21, 2017_____
10       Signature of Approved Transcriber           Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25